IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MILL CREEK COUNTRY CLUB, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 19 C 1971 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| EVERGREEN ALLIANCE GOLF LTD., LP, | ) | |
| PREMIER GOLF MGMT, INC. and | ) | |
| PREMIER GOLD EAGL, G.P, LLC, | ) | |
| (collectively "Evergreen" or "Arcis"), | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

"The rejection of expert testimony is the exception rather than the rule, and
'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'"

*Spearman Industries, Inc. v. St. Paul Fire & Marine Ins. Co.*,
128 F.Supp.2d 1148, 1150 (N.D.Ill. 2001)

The defendants have filed a Motion to Exclude Certain Opinions of Roger Stewart pursuant to Federal Rules of Evidence 702 and 703.[1] For the following reasons, the motion [Dkt. # 94] is

---

[1] While the defendants have characterized their motion as a discovery motion [Dkt. ##112, 113, 114, 115, 116, 117, 118, 119, 120, 122, 123, 124] – defendants even asked for fees as one might with a discovery motion – and added to the discovery referral, motions to exclude evidence under Fed.R.Evid. 702, 703 are not discovery motions. Discovery motions are those brought under Rules 26 through 37 of the Federal Rules of Civil Procedure. *See, e.g.* N.D. Ill. Local Rule 37.2. The defendants' motion is a trial-related motion and, as such, I do not have authority to decide it conclusively. Therefore, the Opinion can be treated as a Report and Recommendation subject to review under Rule 72, Federal Rules of Civil Procedure. It is also worth noting that all discovery in this case closed in May of 2021 [Dkt. #84, #87, #90] and that the defendants' motion was filed on August 3, 2021 [Dkt. #94], nearly three months later. As such, it violated Judge Gettleman's standing order that *Daubert* motions "shall be filed at least 60 days prior to trial, or 10 days prior to the discovery cut-off date, whichever is earlier." Par. 3.D. https://www.ilnd.uscourts.gov/_assets/_documents/_forms/_judges/GETTLEMAN/motionpractice.pdf. As no trial date has been set, the earlier date – 10 days prior to the end of discovery – was clearly long passed by the time defendants filed their motion. Thus, it would seem to be plainly untimely. But, after reviewing the motion, Judge Gettleman

(continued...)

denied.                                                                 **I.**

This case is about the condition of a golf course. The course was leased for twenty years back in October 2018, during which the lessor was responsible for upkeep and, eventually, turning it over in decent shape when the lease was over. [Dkt. #64, Pars. 6, 10]. Along the way, in 2008, defendant Evergreen Alliance assumed those responsibilities. [Dkt. #64, Pars. 14-17]. Evergreen Alliance wanted to surrender possession of the course in February 2012, but that desire prompted a lawsuit from the plaintiff here, Mill Creek. It's not clear what happened, but we are told the case was settled and, apparently, Evergreen Alliance was stuck with the course for another six years. [Dkt. #64, Pars. 18-21]. The golf course closed on October 31, 2018, and Evergreen Alliance surrendered possession on December 18, 2018. [Dkt. #64, Pars. 27-28]. The plaintiff says it inspected the course at that time and found "numerous instances of property damage, negligence, waste and general failure to maintain the Golf Course during the term of the Lease as required under the terms of the Lease and the Amendments thereto." [Dkt. #64, Par. 31].

The condition of the course back in December 2018 – or, more accurately, what an expert with 40 years' experience as a golf course superintendent says about it – is at the heart of this evidentiary dispute. The expert, Mr. Stewart, looked the course over on January 6, 2019, just a couple of weeks after the turnover. And he looked it over a couple of more times, studied photos and videos, and read through some documents regarding the course's shape. In short, he looked at the course from a few different perspectives. And he thought the condition was terrible. He was not alone. Indeed, the course superintendent, in assessing the significant number of repairs and expense

---

[1](...continued)
referred it to me nevertheless. [Dkt. #95].

it would take to bring the course up to standard called it a "Total sh– show." [Dkt. #103-10].

Of course, the defendants don't want Mr. Stewart to testify. They don't want him to testify so badly that they filed a 462-page "Motion to Exclude Certain Opinions of Roger Stewart" under Fed.R.Evid. 702 and 703. It probably should have been entitled "Motion to Exclude Roger Stewart," because the defendants have quite a few bones to pick with Mr. Stewart. Nit-picking might be too strong a word for the defendants' tack, but their motion does put one in mind of the Sixth Circuit's remark about a similar type of attack on all fronts: "When a party comes to us with nine grounds for reversing the [lower court's decision], that usually means there are none." *Fifth Third Mortg. Co. v. Chi. Title Ins. Co.*, 692 F.3d 507, 509 (6th Cir. 2012).

## II.

The colloquialism for this type of motion is "*Daubert* motion," after the Supreme Court decision – *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 589 (1993) – that launched the *Daubert* motion cottage industry. In that case, the Supreme Court held that, under the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert,* 509 U.S. at 589; *see also Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019)(". . . a trial judge, as a gatekeeping matter, is responsible for ensuring that proposed expert testimony "is not only relevant, but reliable."). A few years later, the Supreme Court made clear that the trial judge had a similar "gatekeeping" function regarding non-scientific expert testimony; including testimony based "upon professional studies or personal experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). That, obviously, covers testimony about golf course maintenance standards.

3

It's no secret that *Daubert* has been criticized roundly and repeatedly on a number of levels since it was issued. *See, e.g.,*Frederick Schauer, Barbara A. Spellman, Is Expert Evidence Really Different?, 89 Notre Dame L. Rev. 1, 2–3 (2013)(collecting articles). One of the more frequent criticisms has been, to put it bluntly, what do judges really know about science or the methodologies thereof? Or, in this case, what do they know about golf course maintenance and the methodology experts in that field use to assess courses? I dare say that the trial judge – or "gatekeeper" – who has the ultimate responsibility of deciding whether the evidence at issue here is admissible at trial, probably won't know much about appropriate standards for golf course maintenance.[2] But the grain of the green is what it is.[3]

As just stated, *Daubert* requires a trial judge to exercise a "gatekeeping" function to ensure that expert testimony is both reliable and relevant pursuant to Rule 702. *Daubert*, 509 U.S. at 589–92; *Kumho Tire*, 526 U.S. at 141; *Happel v. Walmart Stores*, Inc., 602 F.3d 820, 824 (7th Cir. 2010). And, again, this inquiry applies not only to scientific testimony, "but to all kinds of expert testimony." *United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002). The description of the court as "gatekeeper" always sounds rather intimidating, often conjuring a vision of some mythological giant or ogre or worse, The Old Man from Scene 24 in "Monty Python and the Holy Grail", dispatching hapless experts into the Gorge of Eternal Peril. But, the required inquiry is not so very strict; it is, in fact, flexible. *Kumho*, 526 U.S. at 141; *United States v. Protho*, 41 F.4th 812, 821 (7th

---

[2] Which brings to mind Supreme Court Justice Elena Kagan's quip during oral arguments in *Gonzalez v. Google*: "You know, it's not like these are the nine greatest experts on the internet." https://www.nytimes.com/2023/02/21/us/google-supreme-court-youtube.html.

[3] There is no small amount of irony in the fact that the defendants, who demanded a jury in this case [Dkt. #5], think that a jury will be ill-equipped to assess Mr. Stewart's testimony.

4

Cir. 2022)("... district courts have 'broad latitude' in deciding both 'how to determine reliability' and in 'the ultimate reliability determination.'"). Rejection of expert testimony is the exception, not the rule. Fed. R. Evid. 702, Advisory Comm. Notes (2000); *United States v. Perry*, 35 F.4th 293, 330 (5th Cir. 2022); *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850 (11th Cir. 2021); *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1001 (8th Cir. 2019); *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019).

The defendants' many criticisms of Mr. Stewart's report demand a more rigid standard than is applicable. "[T]he district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony. ... The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) (citations omitted). In other words, "[a]n expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013); *see also Kirk v. Clark Equip. Co.*, 991 F.3d 865, 873 (7th Cir. 2021)("... the correct inquiry focuses not on 'the ultimate correctness of the expert's conclusions,' but rather on 'the soundness and care with which the expert arrived at h[is] opinion.'"). "The critical inquiry is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data 'only by the *ipse dixit* of the expert' that is properly excluded under Rule 702." *Manpower*, 732 F.3d at 806; *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017).

**III.**

As already suggested, the defendants' motion presents something of a "laser light show of [arguments]" that threaten to be "so distracting as to disturb our vision and confound our analysis." *United States v. Lathrop*, 634 F.3d 931, 936 (7th Cir. 2011)(collecting cases). Simply stated, "more is not necessarily better." Quite the contrary. *Thompson v. Illinois Dep't of Pro. Regul.*, 300 F.3d 750, 759 (7th Cir. 2002); *United States v. Mahoney*, 247 F.3d 279, 282 (D.C.Cir. 2001); *United States v. Brocksmith*, 991 F.2d 1363, 1366 (7th Cir. 1993). It's a strategy that can back-fire as a busy court may miss a truly important point out of the many mediocre ones a movant makes. Nevertheless, this Report and Recommendation will attempt to simply address each of defendants' criticisms, item by item.

> **1. "Stewart's observations of the Golf Course, Tanna Farms, and Orchard Valley should be limited to his analysis of the courses as they existed during the lease term and his photos/observations based on conditions after the lease term should be barred." [Dkt. #94, at 4-6].**

The defendants' first complaint about Mr. Stewart is that he wasn't around to examine the course conditions before it was turned over to the plaintiff, and that makes his testimony inadmissible. It is too often true that counsel are quick to say what their fellow attorneys have bollixed up, without providing any insight into what ought to have been done. Defendants certainly don't give us any inkling here, so one can only imagine.

As the plaintiff points out, expert witnesses do not have the opportunity to view the incident at issue at the time of the occurrence. While we are an extremely litigious society, it hasn't gotten to the point where attorneys station their expert witnesses to survey properties during the terms of leases. Defendants certainly don't provide any authority to suggest such a system, or something

approximating it, is required. Why can't someone who has worked on golf courses all his life provide a reliable opinion as to what a track's condition was likely to have been a year earlier? After all, "[t]rained experts commonly extrapolate from existing data." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). He knows what happens naturally through the seasons and the Midwest weather is predictable and easily ascertainable. And he knows what is more likely due to neglect.

Moreover, as the defendant concedes, Mr. Stewart conducted his first inspection of the Golf Course on January 6, 2019. As the course was turned over just two weeks earlier, an examination couldn't have been much more contemporary. While, Mr. Stewart made later inspections, and made some observations from photographs and video, the quality of the opinions he derived from such observations as to the condition of the course at an earlier time are a matter for cross examination and go to the weight of his testimony, not admissibility.

"Reliability . . . is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc.*, 732 F.3d at 806. "The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Id.* That's exactly what the defendants want the court to do here, though: parse the reliability of an observation made two weeks after turnover, a year after turnover, from a photo, from a video, etc. They offer absolutely nothing to show that Mr. Stewart's methodology was invalid. Obviously, such an argument has to be rejected.

### 2. "Stewart should be barred from comparing the maintenance standards for the Golf Course, Tanna Farms, and Orchard Valley." [Dkt. #94, at 6-7].

Defendants contend that while Mr. Stewart claimed in his report that he reviewed the golf course maintenance standards from Tanna Farms and Orchard Valley in order to prepare his December 18, 2020 Report [Dkt. #94-1, at 31], he was lying because he did not have standards from either course available to him at that time. Therefore, he had no basis to opine that "the maintenance standards by Arcis are not as good as the maintenance standards for Tanna Farms and Orchard Valley." [Dkt. #94-1, at 31].

Well, it turns out that Mr. Stewart *did* have the standards for Tanna Farms at the time he wrote up his Report on December 18, 2020. He received them from plaintiff's counsel on December 12, 2020 [Dkt. # 103-5]. The argument as to Orchard Valley has a bit more traction, but in the end, not much. When he was, deposed, Mr. Stewart allowed that he wasn't sure if he had the Orchard Valley standards when he completed his Report. [Dkt. # 94-2, at 61]. He didn't. Plaintiff didn't even subpoena those standards from third party, Billy Casper Golf Management, until December 22, 2021. [Dkt. #94-3, Page 3, 6 of 7; #82 (ordering compliance with subpoena by February 2, 2021)]. But, he did have the deposition transcript from Bill Rehanek, the senior operator of the company that managed Orchard Valley, who testified at length as to the maintenance of that course. [Dkt. ##94-8, 103-8, at 6/35; 103-14]. That's sufficient to make his testimony admissible.

### 3. "Stewart does not have any expertise in Damages analysis or financial matters and is not qualified to testify as to damages." [Dkt. #94, at 7-8]

Defendants complain that Mr. Stewart has no business opining on whether the plaintiff's damages estimate is reasonable, as he "has no experience in accounting, economics, cost analysis, or estimating damages." But, what would an accountant know about the repairs necessary – and

8

their costs – to bring a golf course up to snuff? Not much, unless the accountant also came to the table with Mr. Stewart's experience in the filed.  Mr. Stewart is a retired certified golf course superintendent with over 40 years of experience as a golf course superintendent. He has worked for both the PGA Tour and TPC Network for 21 years and supervised courses that hosted 17 PGA Tour Champions televised events. He has taught seminars for the Golf Course Superintendents Association of America and turf grass management and soils and nutrition courses at the community college level. He seems like a fellow who could look at line items for course repair work and determine whether they were reasonable.

> Moreover:
>
> The notion that *Daubert* . . . , requires particular credentials for an expert witness is radically unsound. The Federal Rules of Evidence, which Daubert interprets rather than overrides, do not require that expert witnesses be academics or PhDs, or that their testimony be "scientific" (natural scientific or social scientific) in character. . . . Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness.

*Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000)(citations omitted).  *See also Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data.").

Of course, there is a division of labor in a case like this where the expert has a practical background in the subject matter as opposed to being a financial expert. *See, e.g., Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 518 (7th Cir. 2011)(expert was provided with invoices and records to review). Perhaps there is someone who would call in an accountant to inspect a home he were interested in buying. But, most would not.  For our purposes here, a golf course expert seems

9

a better way to go or, at least, is not an inadmissible way to go.

> **4. "Stewart's entire "damages analysis" opining that Mill Creek suffered nearly $1.7 million in damages took 45 minutes according to his time sheets, not enough time to review documents, much less form opinions." [Dkt. #94, at 8-9]**

The defendants also have a quibble with Mr. Stewart's efficiency, complaining that he spent less than an hour reviewing certain materials related to damages. First of all, it's not clear that Mr. Stewart spent only 45 minutes analyzing damages. While it is true that one line item of the many in his invoice reads: "12/10/2020 Zoom Call with Saskia Bryan, Bob Minetz, Jason Dempsay And Al Krause; 1. Review damages .75 hours", it would appear that damages figured into at least a portion of the remainder of the 80 hours he spent with this case. [Dkt. #94-7]. Moreover, golf course maintenance experts, like:

> [l]awyers[,] do not come from cookie cutters. Some are fast studies and others require extra preparation. Some are more nimble on their feet . . . . Some have deeper insight and in a few hours may find ways to prevail (or to curtail costly discovery) that will elude their colleagues.

*Gusman v. Unisys Corp.*, 986 F.2d 1146, 1150 (7th Cir. 1993). The thoroughness of Mr. Stewart's review goes to the weight of his testimony, and is another matter for investigation and cross-examination at trial. *See Douglas Dynamics, LLC v. Buyers Prod. Co.*, No. 09-CV-261-WMC, 2010 WL 4118098, at *2 (W.D. Wis. Oct. 8, 2010)("Moreover, plaintiff's concerns about [defense expert's] thoroughness in reviewing relevant materials do not make [the expert's] opinion unreliable. Instead, they are issues that may be raised to the jury to challenge the weight [the expert's] opinions should carry.").

Moreover, lawyers – and judges – are perhaps not the best people to gauge efficiency. After all, even the highly skilled lawyers in this case have combined to miss multiple deadlines totaling

an additional year's worth of discovery. [Dkt. ## 21, 41, 43, 58, 60, 69, 70 83, 84]. That level of efficiency is not uncommon in litigation, even though it is unlikely to pass muster in other walks of life. Perhaps Mr. Stewart simply operates at a more effective pace.[4]

**5. "Many of Stewart's Other Opinions Parrot the Opinions of Plaintiff's Counsel." [Dkt. #94, at 12-13]**

Here, the defendants charge Mr. Stewart with plagiarism. They complain that "beyond Stewart's on-the-ground observations from his initial site visit, the fact remains that the majority of Stewart's 36-page Report was drafted by Plaintiff's counsel, rendering the opinions expressed therein inherently unreliable." The defendants' charge is based on a couple of snippets of testimony from Mr. Stewart's deposition, and a single line item from his lengthy invoice for his work on this case. First, the line item; defendants point out that Mr. Stewart made the following entry for December 7, 2020: "Review draft of Expert Opinion Report from Bob Minetz. 2.0 hours." One guesses that defendants mean to insinuate that this was the only work Mr. Stewart did on his opinion. But it's a single line item in an invoice that logs nine pages of activity. [Dkt. #94-7]. And, in the wake of that "Review", Mr. Stewart did far more research. [Dkt. #94-7, Page 7-8/9]. And he sent his own edits back to plaintiff's counsel on December 15, 16, and 17, 2020. Finally, Mr. Stewart "sign[ed] off on final report. . . . " [Dkt. #94-7, Page 8/9].

The defendants' criticism of Mr. Stewart's process and plaintiff's counsel's involvement ignores the fact that the cases are uniform in holding that lawyers are not precluded from assisting or being involved in the preparation of Reports. *See Johnson v. City of Rockford*, 2018 WL 1508482,

---

[4] Long about the fourth or fifth day of being taken away from their families and jobs and lives to listen to counsel questioning witness after witness about crab grass and the like, jurors may well admire the comparative efficiency of Mr. Stewart – or at least not think Mr. Stewart inefficient.

n.1 (N.D.Ill.2018); *Lawyer Nursery, Inc. v. Van Meter & Son Nursery, Inc.*, 2009 WL 10678806, *11 (D.Mont.2009); Advisory Committee Notes to Federal Rules of Civil Procedure 26. *See also, infra* at 14. It also ignores the fact that "[t]he purpose of the report is to provide adequate notice of the substance of the expert's forthcoming testimony and to give the opposing party time to prepare for a response." *Meyers v. Nat'l R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 734 (7th Cir. 2010). Under Fed.R.Civ.P. 26(a)(2)(B), a party's disclosure of an expert witness

> must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
>
> > (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> >
> > (ii) the facts or data considered by the witness in forming them;
> >
> > (iii) any exhibits that will be used to summarize or support them;
> >
> > (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> >
> > (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> >
> > (vi) a statement of the compensation to be paid for the study and testimony in the case.

As per the Advisory Committee Notes to Fed.R.Civ.P. Rule 26(a)(2)(B), "Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this assistance may be needed. Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness." That's

what it looks like happened here, especially given the repeated reviews and edits by Mr. Stewart in the wake of the December 7th entry. Indeed, Mr. Stewart testified as to the process at his deposition. (Stewart Deposition., at 115). As such, the Report was written in a manner that reflects the testimony he plans to give.

The back and forth between Mr. Stewart and plaintiff's counsel is certainly no reason to exclude Mr. Stewart as an expert witness. At most, it might be some fodder for cross-examination. *Daubert*, 509 U.S. at 596. As the court said in *Elm Grove Coal Co. v. Dir., O.W.C.P*, 480 F.3d 278, 301 n.23 (4th Cir. 2007):

> The fact that a lawyer has participated in the preparation of his testifying expert's report does not bar the use of the expert's opinion, or necessarily even impeach the expert's reliability. Such participation does, however, potentially impact on the weight to be accorded such opinion evidence. For example, the lawyer could have participated merely as the expert's scrivener, assisting in the report preparation process only, and not directing the witness to emphasize any specific facts or reach any particular opinions. The interplay between testifying experts and the lawyers who retained them should, however, be fair game for cross-examination.

Indeed, it is unsurprising; something along the lines of there being gambling at Rick's Café.

For better or worse, our litigation system involves lawyers taking the normal everyday language of everyday people and translating it into a dialect they think is necessary for the courtroom. Lawyers draft Complaints. They draft Affidavits, and, within certain limits, prepare witnesses to testify on direct and cross examination. People routinely agree to enter into contracts, but it's certainly not their language in the written agreement. One could go on and on. But the fact of lawyers participation in all sorts of endeavors is perfectly appropriate and desirable – and necessary. And, it is unrealistic to insist that a lawyer has no legitimate role to play in the preparation and presentation of anticipated experts. The basic reality of litigation teaches that a lawyer is not

going to present an expert who does not say what that lawyer believes appropriate and essential to the successful outcome of the case. This basic reality applies to plaintiffs and defendants, alike. Not surprisingly, in case after case, experts contradict each other, and are nonetheless allowed to testify. *See* Fed.R.Evid. 702, Advisory Comm. Notes (2000)("When a trial court, applying this amendment, rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable."); *Moore*, 995 F.3d at 850; *United States v. Hodge*, 933 F.3d 468, 477 (5th Cir. 2019); *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012).

But, the salient point here is that Mr. Stewart had significant and substantial involvement in his Report, and the opinions expressed are his. *See, e.g., Manning v. Crockett*, No. 95 C 3117, 1999 WL 342715, at *3 (N.D. Ill. May 18, 1999)(". . . some attorney involvement in the preparation of an expert report is permissible, but that the expert must also substantially participate in the preparation of his report."). His report was clearly not "ghost-written." *See First Midwest Bank v. Rush Univ. Med. Ctr.*, No. 18 C 2382, 2020 WL 4284554, at *2 (N.D. Ill. July 27, 2020)("While there is no dispute that counsel drafted the experts' reports, there is also no indication that the experts were not sufficiently involved in their preparation such that the reports may not be fairly considered as setting forth their own opinions."); *Isom v. Howmedica, Inc*., No. 00 C 5872, 2002 WL 1052030, at *1 (N.D. Ill. May 22, 2002)(expert "was sufficiently involved in the preparation and revision of the report that it may be fairly considered as setting forth his opinions, not those of counsel. We reject a formalistic approach which would require that the expert be the person who actually puts pen to paper (or fingers to keyboard)."); *United States v. Kalymon*, 541 F.3d 624, 638 (6th Cir.1998) ("A party's attorney can reduce an expert's oral opinion to writing so long as the report reflects the actual views of the expert."); *Lehman Bros. Holdings v. Laureate Realty Servs., Inc*., No.

14

1:04CV1432-RLY-TAB, 2007 WL 2265199, at *2 (S.D. Ind. Aug. 6, 2007)("Thus, the determinative question with respect to whether there has been compliance with respect to the "preparation" of a Rule 26(a)(2) report is not who actually penned an expert's report, but whose opinions and analysis the report contains."); *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 933 (W.D. Wis. 2007)("Despite defendants' assertions to the contrary, the fact that plaintiffs' counsel drafted [expert's] initial and revised declarations is not a ground for excluding his report and testimony. . . . Although an expert report "should be written in a manner that reflects the testimony to be given by the witness and ... must be signed by the witness," it need not be drafted by him."); *see also StoneEagle Servs., Inc. v. Pay-Plus Sols., Inc*., No. 8:13-CV-2240-T-33MAP, 2015 WL 3824170, at *7 (M.D. Fla. June 19, 2015)(expert was not a "mere conduit" for defense counsel where expert "asked Defendants' counsel to prepare a draft of his opinion, to which [expert] provided extensive corrections to ensure that his opinion was conveyed. . . . Rather, [expert] was actively engaged in the production of his expert reports."). He should not be disqualified as a witness under these circumstances.

**6. Mr. Stewart Relies on the Unreliable Golf Advisor "Report"[Dkt. #94, at 13-15]**

Finally, the defendants complain that Mr. Stewart relied on a website called "Golf Advisor" where golfers post reviews of courses. "Relied" seems a bit of an exaggeration. Mr. Stewart testified that he thought the reviews from the website were "relevant" to his report "because the reviews that were given by the customers of Mill Creek reflected their like or dislike of the golf course, golf course conditions, the service that was supplied when they played. [Dkt. #94-2, at 12-13]. He reviewed the comments, and "did use them to add to the information that I used to form my opinion." [Dkt. #94-2, at 14]. Mr. Stewart's reference to the Golf Advisor reviews comes well

15

toward the end of Mr. Stewart's Report and appears to play no more than a collateral part in the entire, overall, 37-page Report. [Dkt. # 94-1, at 24-26].

To the extent Mr. Stewart did "rely" on the reviews on the Golf Advisor website, "the reliability of the data itself is not the object of the *Daubert* inquiry. The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury. *Manpower, Inc.*, 732 F.3d at 808. "The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower*, 732 F.3d at 806; *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir.2000)("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment.").[5] Juries are familiar with website reviews and have an idea about their reliability. The jury will have little trouble bringing that familiarity to bear if cross-examination shows Mr. Stewart relied too heavily on the Golf Advisor comments.

### IV.

In the end, the date Mr. Stewart examined the course, his review of the standards from comparable courses, the time he spent going over costs, the interplay between him and counsel, and his references to comments from online reviews or from meetings – all of it – goes to weight rather than admissibility. And all of it will be fair game for "vigorous cross-examination." *Daubert*, 509 U.S. at 596. Of course, this not the end of the inquiry as a trial date has not even been set. As trial

---

[5]The same goes for the list of "verbatim comments" from a meeting that Mr. Stewart referenced n his report. [Dkt. #94-1, at 15-16].

judge, Judge Gettleman will have the final word on admissibility of Mr. Stewart's testimony. The trial judge's gate-keeping role continues through the trial; even to the point of concluding "that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true [and] . . . direct[ing] judgment . . . ." *Daubert*, 509 U.S. at 596.

## CONCLUSION

The defendant's *Daubert* Motion to Exclude Certain Opinions of Roger Stewart [Dkt. #94] is denied for the reasons discussed herein. Fact and expert discovery in this four-year-old case closed in May of 2021. [Dkt. ##87, 90]. The parties have had a post-discovery settlement conference, which was unsuccessful. [Dkt. #96]. The parties' attention is called to the time limits imposed by Rule 72, Federal Rules of Civil Procedure, governing review of decisions by a Magistrate Judge. All matters relating to the referral of the objections to the expert report of Roger Stewart having been resolved, the referral is closed and the case is returned to Judge Gettleman.

**ENTERED:** _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 4/7/23